DAVID CHRISTOPHER LEE WALTON,

      Plaintiff,

      v.                             Case No. 21-C-1443

HANNAH UTTER,

      Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Plaintiff David Christopher Lee Walton, a prisoner at Green Bay Correctional Institution (GBCI) who is representing himself, is proceeding on an Eighth Amendment deliberate indifference claim against Defendant Hannah Utter, a registered nurse and the manager of the Health Services Unit (HSU) at GBCI. Walton is proceeding based on assertions that Nurse Utter refused to enter a crushed medication order even though he threatened to overdose if his medication was not crushed. Walton followed through on his threat to overdose and now seeks to hold Nurse Utter liable for the alleged injury and harm caused by the overdose. On October 13, 2022, Nurse Utter moved for summary judgment. The Court will grant Utter's motion and dismiss this case.

## BACKGROUND

      At the relevant time, Walton was incarcerated at GBCI. Prior to arriving at GBCI, Walton had a history of self-harm, including several attempted hangings, hunger strikes, and hoarding and misusing his medication. After Walton attempted to overdose while at Waupun, his provider ordered that his prescription for Carbamazepine be crushed, rather than administered in whole pill

form. Some inmates are prescribed crushed (powder) medication and/or liquid forms of medication to prevent hoarding and misuse. Dkt. No. 23 at ¶¶1-5, 9-11.

On October 28, 2021, Walton transferred to GBCI. When an inmate transfers to another facility, a crushed medication order carries over to the new facility. Providers at the new facility evaluate whether to continue the order. When Walton transferred to GBCI, providers evaluated Walton's medication list and decided to switch his medications from crushed to whole pill. Advanced Practice Nurse Prescriber (APNP) Virginia Trzebiatowski, who reviewed Walton's prescriptions upon his arrival at GBCI, decided to discontinue Walton's non-essential medications so he would receive the fewest number of pills necessary for his medical needs. APNP Trzebiatowski also noted that Walton had a history of assault on female staff and that, at GBCI, crushed medications are primarily administered by female nursing staff (as opposed to whole pills, which are primarily administered by male corrections officers). APNP Trzebiatowski concluded that continuing the crushed medication order would create a security and safety concern for female nursing staff. *Id.* at ¶¶1, 12-15; Dkt. No. 24-1 at 95.

A few days after his transfer, Walton submitted a health services request addressed to "HSU Manager," requesting that his medication be crushed. Walton indicated that his medications should be crushed for safety concerns because he would overdose if they were not crushed. Nurse Utter did not review or respond to the request. Instead, that same day, another nurse responded, "Per GBI procedure your medications are not crushed at this time. Please discuss further medication questions at your follow up with the providers. Indefinite crush meds is not progress per your health care needs." Dkt. No. 23 at ¶¶18-20; Dkt. No. 27 at ¶18.

The next day, on November 1, 2021, Walton took approximately twenty-five pills that he had accumulated over the prior three days. Walton was transported to the emergency room for further evaluation. Walton asserts that, on the way to the hospital, he convulsed, twitched, and

2

jerked uncontrollably before briefly losing consciousness. At the hospital, Walton, who was awake, calm, and cooperative, reported mild nausea. His vitals were normal, and labs revealed undetectable acetaminophen levels and no evidence of impaired kidney function. The only treatment Walton received was IV fluids. Walton was discharged after being observed for about five hours. Dkt. No. 23 at ¶¶21-23; Dkt. No. 27 at ¶¶21-23.

On November 4, 2021, Walton filed an inmate grievance about not receiving crushed medications. In the course of investigating the complaint, the institution complaint examiner contacted Nurse Utter. Nurse Utter's interaction with the institution complaint examiner is her only involvement in this incident. Nurse Utter did not discontinue Walton's crushed medication order, and she did not respond to Walton's health services request that the order be reinstated. Dkt. No. 23 at ¶¶26-28.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at

3

trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

Walton's claim is predicated on the principle adopted by the Supreme Court in *Estelle v. Gamble* that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." 429 U.S. 97, 104 (1976) (internal quotation marks and citation omitted). The principle derives from the fact that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* at 103. The same principle applies to other risks of harm inmates face due to the fact of their incarceration. In *Farmer v. Brennan*, for example, the Court held that deliberate indifference to a substantial risk of serious harm posed by other inmates likewise violates the Eighth Amendment. 511 U.S. 825, 833 (1994). As the Court explained, "[h]aving incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* (internal quotation marks and brackets omitted).

Application of this principle to cases like this poses some difficulty. Here, the threatened harm from which Walton claims Nurse Utter failed to protect him was not a serious medical condition he contracted, nor was it another inmate intent on attacking him; the threatened harm toward which Walton claims Nurse Utter exhibited deliberate indifference was his own conduct. Walton sent a Health Services Request to HSU in which he stated that if his medications were not crushed, he would overdose, as he had in the past. Dkt. No. 24-1 at 72. Because Nurse Utter failed to "address or fix the problem," Compl., Dkt. No. 1 at 4, Walton claims that Nurse Utter is liable for the pain and suffering he endured as a result of his subsequent overdose. In this respect,

4

Walton's case is like an increasing number of self-harm cases brought by inmates against prison staff and officials in this and other districts.

The assumption underlying Walton's claim, and the legal theory on which it is based, is that he is not responsible for his own actions; that his behavior is the result of factors beyond his control. After all, if he freely chose to injure himself by overdosing on his medication, it would hardly seem fair or just to hold Nurse Utter liable for his injuries. She did not force the medication down his throat. If he deliberately injured himself, why should she be held liable?

It is true that severe mental illness or disease can rob one of control over his faculties and relieve him of legal responsibility for even criminal conduct. *See, e.g.*, Fed. R. Crim. P. 12.2; Wis. Stat. § 971.15. And where such mental incapacity is shown, those having custody and control of such persons have a duty to protect them from themselves. But our legal system assumes that absent such a condition, a person is responsible for his own intentional conduct. *See Morissette v. United States*, 342 U.S. 246, 250 (1952) (noting "belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil" is universal and persistent in mature legal system).

The fact that Walton is serving a sentence for a crime suggests that he does not have the kind of severe mental illness that would absolve him of legal responsibility for his conduct. There is no record of him having been found not guilty by reason of mental disease or defect and, of course, if he had, he would not be serving a sentence for a crime at GBCI. This is not to say, however, that he has no psychiatric disorders. His medical record indicates he has been diagnosed with a number of disorders, and he does have a history of trying to harm himself, although the seriousness of his intent, as well as the severity of the harm intended, are less than clear. An October 1, 2021 Psychiatric Progress Note from Walton's medical record reads:

5

> Per his PSU file, he reported receiving treatment in the community for PTSD, ADHD, and Bipolar Disorder. He also reported hanging himself as a result of his divorce in 2009, as well as hanging himself in the county jail in 2015 (he later stated this was a misunderstanding). While in the DOC, Mr. Walton has been diagnosed with Antisocial Personality Disorder, Anxiety Disorder NOS, Personality Disorder NOS, Malingering, and Adjustment Disorder. He was placed in observation status once in 2009 after he tied a sheet around his neck and ate toothpaste and ink. Mr. Walton completed the Coping Skills program at WRC in 2013. He returned to WRC for programming in 2016, but was discharged in 2017 for lying on staff.

Dkt. No. 24-1 at 50. But Walton does not appear to have the kind of severe mental illness that would permit a commitment to a mental health facility or support a finding of incompetence.

In *Miranda v. County of Lake*, the court suggested that "incarcerated persons . . . have been deemed incompetent." 900 F.3d 335, 349 (7th Cir. 2018) (citing *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006). But there are problems with deeming all self-harming inmates incompetent. Any such presumption must be for a quite limited purpose. No doubt, Walton could be held criminally responsible if he assaulted a guard or another inmate. Under such a theory, it is apparently only for assaults on themselves that Walton and similarly situated inmates would be deemed incompetent.

Presuming all self-harming inmates incompetent leads to other problems as well. It ignores the sane suicide, a phenomenon which the court acknowledged in *Freeman*. 441 F.3d at 546 (describing prisoner who "is perfectly sane, but he either wants to commit suicide (and there are rational suicides) or he is prepared to risk death from a hunger strike to make a political point"); *see also Taylor v. Wausau Underwriters Ins. Co.*, 423 F. Supp. 2d 882 (E.D. Wis. 2006) (action brought by estate of correctional officer with no mental health history who hung himself in jail after arrest for sexual assault of minor). Such a presumption also creates perverse incentives that can encourage self-destructive behavior by inmates and that undermine the ability of correctional institutions to maintain order and security. *See, e.g., Goodvine v. VandeWall*, No. 16-C-890, 2018 WL 460121, at *9 (E.D. Wis. Jan. 17, 2018) ("one can reasonably wonder if Goodvine would

6

continue to persist in such behavior if it did not garner him the kind of attention he has received and fuel his multiple federal cases against correctional staff and administration"); *Bowers v. Pollard*, 602 F. Supp. 2d 977, 933 (E.D. Wis. 2009), *aff'd* 345 F. App'x 191 (7th Cir. Sept. 17, 2009) (noting difficulty prison officials face in trying to protect inmate from himself).

Notwithstanding these considerations, the law in this circuit is clear: "All agree that suicide is an objectively serious medical condition. Our case law makes equally clear that prison officials cannot intentionally disregard a known risk that an inmate is suicidal." *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020). Even under that established law, however, Walton's claim fails.

Walton asserts that Nurse Utter violated his constitutional rights because she was deliberately indifferent to the substantial risk of self-harm that he faced with his medications being administered in whole pill form. "Prison officials can be held liable if they are aware of an objectively serious risk of harm to an inmate and knowingly or recklessly disregard it. Their duty extends to protecting inmates from imminent threats of serious self-harm, and the obligation to intervene covers self-destructive behaviors up to and including suicide." *Szopinski v. Koontz*, 832 F. App'x 449, 451 (7th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 846 (1994); *Miranda*, 900 F.3d at 349). However, a defendant will be liable for damages under §1983 only if she was personally responsible for the deprivation of a constitutional right, meaning that the deprivation occurred at the defendant's behest or with her knowledge and consent. *See Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019).

Nurse Utter is entitled to summary judgment because Walton fails to create a triable issue regarding whether she was personally responsible for the decision to cancel his crushed medication order or for the decision to deny his request to reinstate the order. Nurse Utter explains that Walton's provider reviewed the order for crushed medication and decided to cancel the order based on Walton's history of assaulting female staff. To mitigate the risk of misuse, the provider

7

canceled all non-essential medications to limit the number of pills administered to Walton. Nurse Utter further explains that a nurse reviewed and responded to Walton's request that his order for crushed medication be reinstated. Nurse Utter clarifies that she was not involved in the provider's decision to cancel the order or the nurse's refusal to reinstate the order.

Walton does not dispute that his provider and the nurse were the primary decision makers; instead, he highlights that, as health services manager, Nurse Utter supervised and was responsible for the actions of her staff. *See* Dkt. No. 26 at 2-3. It has long been held, however, that the doctrine of *respondeat superior* cannot be used to hold a supervisor liable for the misconduct of a subordinate. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). The only time a supervisor will be held liable for a subordinate's misconduct is if the supervisor directs or consents to the misconduct. For example, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye" for fear of what they might see. *Id*. (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988)). "[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable." *Jones*, 856 F.2d at 992. Walton offers no evidence supporting a conclusion that Nurse Utter knew about his desire for crushed medication, let alone that she knew his provider had canceled his prior institution's order and that a nurse had refused his reinstatement request. The mere fact that Nurse Utter was their supervisor is insufficient to rebut her sworn testimony that she was not involved in those decisions.

Moreover, even if Nurse Utter had known about his provider's decision to cancel the crushed medication order, she would have been entitled to defer to the provider's decision. According to Nurse Utter, the order was canceled because, just two months prior to his transfer to GBCI, Walton had "followed a nurse into an exam room, barricaded the door with a med cart, turned off the light, and proceeded to assault the female nurse." Dkt. No. 28-1 at 27. Because at GBCI crushed medications are administered primarily by female nursing staff, the provider

8

decided that it would be a safety and security risk to the nurses to continue the order. To mitigate the risk of Walton misusing his medication, the provider canceled all non-essential medications, thereby limiting the number of whole pills administered to Walton. Given the provider's efforts to protect the nursing staff and also address the risk Walton posed to himself, Nurse Utter would have been entitled to defer to the provider's decision. *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012).

## CONCLUSION

For these reasons, Defendant Hannah Utter's motion for summary judgment (Dkt. No. 21) is **GRANTED** and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 21st day of November, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.